# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| HOUSTON CASUALTY COMPANY | CIVIL ACTION |
| VERSUS | NO: 10-3367 |
| SUPREME TOWING CO., INC. | SECTION: "E" (4) |

## ORDER

Before the Court is **Stone Energy Offshore, L.L.C's Motion to Compel Production of Documents Withheld as Privileged (R. Doc. 169)**, filed by Counter-Claimant, Stone Energy Offshore, LLC ("Stone"), seeking an order from this Court requiring Plaintiff, Houston Casualty Company, ("HCC") to produce documents withheld as privileged. HCC opposes the motion. (R. Doc. 177). The motion was heard on oral argument on Wednesday, August 8, 2012.

## I.     Factual Background

This matter was filed by HCC, who seeks Declaratory relief pursuant to Federal Rule of Civil Procedure ("Rule") 57 and 28 U.S.C. § 2201, *et seq.*, that it does not owe any marine insurance coverage to Defendant, Supreme Towing Co., Inc., ("Supreme Towing") for its liability as a result of an allision between an unmanned oil well and the *M/V CAPTAIN BRENNAN*.

Supreme Towing, as the named insured under a policy issued by HCC, made a claim for defense and indemnity as a result of a lawsuit filed by Bois D'Arc Energy, Inc., and its successor

in interest, Stone.[1]  On November 8, 2007, HCC issued a reservation of rights and non-waiver letter

to Supreme for failure to comply with Coast Guard regulations regarding the navigation of the *M/V*

*CAPTAIN BRENNAN*.  In this reservation of rights, HCC reserved all rights to decline coverage for

Stone's claims based on Supreme's failure to comply with the terms, conditions, warranties, and

exclusions of the policy.  It did, however, agree to fund Stone's defense of the lawsuit, pursuant to

the terms of the policy.

The related claim, a limitations action, involved an accident which damaged Stone's Main

Pass Well # 14 and structures, equipment, and oil and gas produced from the well.  On or about July

28, 2007, the well was damaged as the result of an allision with a vessel.  The matter was bifurcated

for trial and litigated in *In Re: Supreme Towing Co., Inc. as Owner and Operator of the M/V CAPT.*

*BRENNAN*, No. 2:07-cv-09231-JCZ-KWR.

On August 12, 2010, the presiding Judge found that Supreme was solely liable for the

allision for failing to comply with Coast Guard navigational regulations and by failing to equip the

vessel with up to date navigational charts, electronic navigational charts, data, and up to date notices

to mariners.  Following the August 12, 2010 decision in the related litigation, HCC issued an

additional reservations of rights and non-waiver letter to Supreme, on September 29, 2010, expressly

reserving all rights to decline coverage for Supreme's defense and indemnity.

On June 13, 2011, Stone propounded written discovery requests to HCC in this case, which

included fourteen (14) requests for production.  Among its requests for production, Stone

specifically requested production of:

(1)  All correspondence between HCC and Greg Ernst ("Ernst"), counsel for Supreme

---

[1]Supreme Towing is the named insured under Policy No. CUL 15010.126 from Houston Casualty with effective
dates of December 20, 2006 through December 20, 2007.  *See generally* (R. Doc. 1-2, pp. 1-85).

Towing;

(2)    All correspondence between HCC and Jeff Sanford ("Sanford"), counsel for Capt. John Barrios ("Captain Barrios");

(3)    All correspondence between HCC and Dunbar Healy ("Healy"), the coverage adjuster for HCC regarding Stone's claim in the Limitation Action, regarding the Limitation Action;

(4)    All correspondence between HCC and Mike Shreve ("Shreve"), representative of HCC, regarding the Limitation Action;

(5)    All correspondence between Dwayne Dikeman[2] and Harold Vines ("Vines") regarding the
Limitation Action;

(6)    The loss report received by HCC regarding the underlying accident;

(7)    The entire claims file for Supreme Towing;

(8)    HCC's Litigation Guidelines; and

(9)    All documents provided to employees or adjusters regarding the issuance of reservations of rights.

On July 11, 2011, HCC produced numerous documents, but asserted various privileges to over 500 documents as noted in HCC's Supplemental Privilege Log of July 16, 2011. After a discovery conference with Stone regarding HCC's responses, HCC then issued supplemental responses on February 16, 2012. (R. Doc. 169-1, p. 8; Ex. 14). On July 9, 2012, counsel for Stone wrote to HCC's counsel to address Stone's challenge to numerous privilege objections asserted by HCC. Counsel for HCC responded by letter dated July 18, 2012, in which HCC maintained all of its privilege assertions.

By further discovery conference on Thursday, July 19, 2012, counsel for Stone informed counsel for HCC that Stone intended to raise other challenges to HCC's privilege assertions. On Friday, July 20, 2012, HCC provided an additional Privilege Log of documents withheld. (R. Doc.

---

[2]There appear to be several persons affiliated with HCC whose names are "Dikeman," "Duickman," and "Dyckman." in the instant matter. In addition to "Dwayne Dikeman," "Duane Dyckman" and "Diane Dyckman" are also referenced. The parties do not specify which of these names they refer to in the documents on HCC's July 16, 2011 Privilege Log. Because the parties have not been clear, for purposes of the instant motion the parties appear to refer to Diane Dyckman, HCC's Vice President of Claims, unless otherwise specified.

169-1, p. 8; Ex. 18).  In response to a subpoena, HCC also produced a list of documents from the Marcello Agency which HCC maintains are privileged.  In all of these responses, HCC maintained its privilege objections to numerous documents responsive to Stone's requests for production, including privilege objections to the requests for production specifically listed above.[3]

As to the instant motion, Stone seeks an order from this Court requiring HCC to produce documents withheld as privileged.  Stone argues that the documents requested are not protected by the common interest, attorney-client, or work product privileges, and that HCC should be required to produce them.  Stone specifically seeks production of the following:

(1) **Communications Involving Greg Ernst not Protected by Common Interest Privilege and/or Placed at Issue by HCC**:

Nos. 8, 11-12, 16, 18, 22, 24-25, 27, 32, 34, 36, 38-39, 41, 45, 47, 51, 54, 56-57, 67,[4] 59, 64, 66-67, 73-80, 84-85, 87, 90-91, 93-96, 104, 106, 109, 114, 117-23, 125-29, 132-33, 135, 137-39, 141, 143-44, 146-50, 159, 171, 173, 181, 183-86, 192, 194-99, 201, 205-07, 210, 212-14, 217, 219-20, 222, 225-26, 230, 232, 240, 243-47, 250-51, 253-55, 261-62, 264-65, 267, 271-76, 280, 282-83, 287-88, 290-91, 293-95, 299-307, 309, 311, 319-20, 324, 326, 328-32, 339, 343, 346-48, 356-57, 361, 363, 350-51, 370-74, 377, 380, 386-87. (Ex. 13).

(2) **Communications Involving Jeff Sanford not Protected by Common Interest Privilege and/or Placed at Issue by HCC**:

Nos. 13, 15, 19, 21, 28, 30-31, 42, 44, 53, 67, 187, 189, 202, 204, 227, 229, 233, 235, 256, 258, 277, 279, 366-69, 381, 383-84, 388, 390. (Ex. 13).

(3) **All Documents on Marcello Agency Privilege Log**:

(Ex. 19).

_____

[3]Further, and as noted below, HCC subsequently obtained a declaration from Ernst, which it produced to Stone and which both parties filed in support their respective motions for summary judgment. *See* (R. Doc. 171; R. Doc. 173).

[4]It is unclear whether Stone requests Document "67 " here.

(4)     **Documents Placed at Issue by HCC**:

Nos. 68-72 (Ex. 13); and

(5)     **Internal Documents not Subject to Attorney-Client Privilege or Work-Product Privilege**:

Nos. 2-7, 63, 71, 103, 105, 112-13, 140, 142, 145, 148, 151-56, 164-65, 167-68, 284-86, 296-98, 308, 327, 333-38, 342, 352-53, 393, 398, 418-35, 439-41, 447, 462, 464, 466-68, 471, 475-77, 479, 485-86, 494, 500-13. (Ex. 13).

(R. Doc. 169-1, pp. 13-14 (formatting altered). Alternatively, to the extent that the Court finds that

a common interest privilege exists and that an attorney-client privilege and/or work product

privilege exists, Stone requests that the Court conduct *in camera* review of the following documents:

**Communications Involving Greg Ernst**:

Nos. 8, 11-12, 16, 18, 22, 24-25, 27, 32, 34, 36, 38-39, 41, 45, 47, 51, 54, 56-57, 67,[5] 59, 64, 66-67, 73-80, 84-85, 87, 90-91, 93-96, 104, 106, 109, 114, 117-23, 125-29, 132-33, 135, 137-39, 141, 143-44, 146-50, 159, 171, 173, 181, 183-86, 192, 194-99, 201, 205-07, 210, 212-14, 217, 219-20, 222, 225-26, 230, 232, 240, 243-47, 250-51, 253-55, 261-62, 264-65, 267, 271-76, 280, 282-83, 287-88, 290-91, 293-95, 299-307, 309, 311, 319-20, 324, 326, 328-32, 339, 343, 346-48, 356-57, 361, 363, 350-51, 370-74, 377, 380, 386-87. (Ex. 13).

**Communications Involving Jeff Sanford**:

Nos. 13, 15, 19, 21, 28, 30-31, 42, 44, 53, 67, 187, 189, 202, 204, 227, 229, 233, 235, 256, 258, 277, 279, 366,69, 381, 383-84, 388, 390.[6]

**Internal Documents**:

Nos. 2-7, 63, 71, 103, 105, 112-13, 140, 142, 145, 148, 151-56, 164-65, 167-68, 284-86, 296-98, 308, 327, 333-38, 342, 352-53, 393, 398, 418-35, 439-41, 447, 462, 464, 466-68, 471, 475-77, 479, 485-86, 494, 500-13. (Ex. 13).

HCC opposes the motion and argues that it has properly withheld various documents

_____

[5]It is unclear whether Stone requests document "67" here, given that "67" was already requested later and would be out of sequence here.

[6]This list does not contain an exhibit, although it is identical to the "exhibit 13" list from above.

regarding communications with Greg Ernst and/or Jeff Sanford, counsel for Supreme Towing and Capt. John Barrios, respectively, as well as documents reflecting the mental impressions and trial strategy of Greg Ernst and/or Jeff Sanford; certain documents contained in the Marcello Agency's response to a *subpoena duces tecum*; and documents contained in HCC's claims file.

## II. **Standard of Review**

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." *Id.* at 26(b)(1). The Rule specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Herbert v. Lando*, 441 U.S. 153, 177 (1979). Nevertheless, discovery does have "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). Furthermore, "it is well established that the scope of discovery is within the sound discretion of the trial court." *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009); *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1096 (6th Cir.1994).

Under Rule 26(b)(2)(C), discovery may be limited if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the discovery sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. *Id.* In assessing whether the burden of the discovery outweighs its benefit, a court must consider: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed

6

discovery in resolving the issues.  *Id.* at 26(b)(2)(C)(iii).

### III.  Analysis

#### A.  Choice of Law for Privilege Application

The parties dispute whether Louisiana or Federal law controls the court's privilege inquiry.

Thus, before the Court can address the substantive issue, it must first consider the issue of which

attorney client privilege law applies, federal or state.  Federal Rule of Evidence 501 states:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense
> as to which State law supplies the rule of decision, the privilege of a witness . . . shall
> be determined in accordance with State law.

*Id.*  The argument for applying federal law arises because this is a declaratory judgment proceeding

brought under both Rule 57 and the federal declaratory judgment act, 28 U.S.C. § 2201 *et seq.*, as

well as under the general maritime jurisdiction of the District Courts under Rule 9(h).  The argument

for applying state law stems from the fact that the central consideration in this case is to determine

liability under an insurance policy, which in turn involves interpretation of an insurance contract.

Although this case was brought pursuant to the general maritime jurisdiction of the federal

courts, as well as the federal declaratory judgment act, the Supreme Court has held that state law

controls the adjudication of marine insurance liability disputes, unless a directly contravening

federal maritime law exists.  *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320-

21 (1955); *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (finding that a contract to insure

a ship is maritime).  "[T]he interpretation of a marine contract of marine insurance is - in the absence

of a specific and controlling federal rule - to be determined by reference to appropriate state law."

*Ingersoll-Rand Financial Corp. v. Employers Ins. Of Wassau*, 771 F.2d 910, 911-12 (5th Cir. 1985).

"In case after case, we have applied state law in interpreting marine insurance policies, because there

is no contrary federal admiralty rule." *INA of Texas v. Richard*, 800 F.2d 1379, 1381 (5th Cir. 1986). Therefore, state law provides the rule of decision in a marine insurance contract, and this is a declaratory judgment action brought to determine liability under a marine insurance contract. Since state law provides the rule of decision, the applicable privilege laws will also be determined according to state law.

The next issue is to determine which state law applies. In the Fifth Circuit, suits where jurisdiction is premised upon admiralty utilize federal choice of law principles, regardless whether state law or federal law provides the rule of decision. *See, e.g., Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 890 (5th Cir. 1991); *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 241-42 (5th Cir. 2009). Typically, where, as here, the insurance contract disputes contain a choice of law provision, federal courts will uphold that provision. *Great Lakes Reinsurance (UK) PLC*, 585 F.3d at 242. (*See generally* R. Doc. 1-2; R. Doc. 177, p. 5 n.2).[7]

The Fifth Circuit has found that where, as here, parties to a marine insurance policy fail to include a choice of law provision in their agreement, the court must determine which state has "the most significant relationship to the substantive issue in question." *Albany Ins. Co.*, 927 F.2d at 891 (quotation omitted). For example, the *Wassau* court found that applying Louisiana law was appropriate where the policy (1) was delivered in Louisiana, (2) insured Louisiana property of a Louisiana owner, (3) the loss occurred in Louisiana, and (4) the action in this case involved two foreign corporations authorized to do business in Louisiana, and the course of business dictated the

_____

[7]Although the "General Conditions and/or Limitations" section of the policy contains provisions for, *inter alia*, notice and settlement of claims, it does not contain a choice of law provision. (R. Doc. 1-2, pp. 60-62). The policy does, obviously, include provisions regarding the physical extent of coverage. For example, it includes a "navigation warranty" which insures the vessels for "[i]nland and coastal waters between Brownsville, Texas and Jacksonville, Florida, including East Coast, not exceeding 50 miles offshore." (R. Doc. 1-2, p. 26). One ship covered by the policy, "Miss Melinda," was granted a warranty for occasional travel as far north as New York Harbor. *Id.* The "Loss Payee" in this case, Supreme Towing, was located in Gretna, LA. *Id.* at 41.

result here. *See Wassau*, 771 F.2d at 912.

In the limitation action related to this case, Judge Zainey found that the accident occurred in Louisiana waters. No. 07-9231A, pp. 1-2; (R. Doc. 1-2, 88-90). Supreme Towing is a Louisiana corporation; HCC is a Texas corporation. (R. Doc. 1, p. 2; R. Doc. 7, p. 2). Supreme Towing is the named insured under a policy issued by HCC. (R. Doc. 1, p. 3; R. Doc. 7, p. 2).[8] Although not identical, the similarities between the facts of the instant case and that in *Wassau* are strong enough for the Court to conclude that Louisiana law applies.[9]

## B. Application of Privilege

Having determined that Louisiana law applies, the next consideration is whether the documents are protected from disclosure. Federal Courts have never recognized an insurer-insured privilege per se. *See Pearson v. Miller*, 211 F.3d 57, 67 (3d Cir. 2000) ("[F]ederal courts have never recognized an insured-insurer privilege as such.") (quoting *Linde Thomson Langworthy Kohn & VanDyke, P.C.* v. *Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (internal quotations omitted)). Further, Louisiana law , the applicable standard of review in this case, does not expressly provide for an insurer-insured privilege but instead speaks in terms of representative of the client.[10]

---

[8]HCC's allegation, which was admitted by Supreme Towing upon information and belief, states in part "[a] copy of the [HCC] policy is attached hereto as Exhibit 'A' and is incorporated herein by reference, as if copies *in extenso*."

[9]The parties do not indicate where the policy was delivered, either in complaint, the filings made in connection with the instant motion, or in their respective motions for summary judgment. *See* (R. Docs. 1, 169, 171, 173, 177, 199). However, exhibits to the pleadings state that the policy was "issued to" Supreme Towing. *See, e.g.*, (R. Doc. 173-3, p. 22). Supreme Towing is a Louisiana corporation. *See, e.g.*, (R. Doc. 1, p. 2; R. Doc. 7, p. 2). Moreover, the Complaint contains a "certificate of coverage" signed by a representative of Continental Underwriters on 2/1/07 in New Orleans, LA. (R. Doc. 1-4, p. 26). The document does not indicate that the insurance was "delivered" and does not include any signature or confirmation of service to the assured, Supreme Towing. *Id.*

[10]In Louisiana, a party may preclude disclosure of communications which are:

made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the

Where as here the insurance company retains defense counsel to protect its insured, a close review of the nature of the relationship is required. Consequently, the attorney-client relationship in the insurance setting is more complex than in other litigation scenarios because it involves the sharing of information by the lawyer or client with a third party (an insurance company) and protects only those communications between a client and an attorney for the purpose of obtaining legal advice.[11]

In addition to the attorney-client privilege, the "joint defense" or "common interest" doctrine protects information shared among parties involved in litigation who are represented by separate counsel but who are engaged in the joint defense of a claim. The doctrine is not technically a privilege in and of itself; instead, it creates an exception to the general rule that the attorney-client privilege is waived when privileged information is voluntarily disclosed to a third party.[12]

The "joint defense" doctrine was established to facilitate communications between aligned parties to protect their common interests in a litigated matter with respect to communications designed to further that joint legal effort. The execution of a joint defense or common interest

client in connection with such a communication, when the communication is:
(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.
. . .
(3) By the client or his lawyer, or a representative of either, to a lawyer, or representative of a lawyer, who represents another party concerning a matter of common interest.

LA. CODE. EVID. ANN. art. 506(B)(3). However, the privilege is waived when the communication at issue "[w]hich is relevant to a matter of common interest between or among two or more clients if the communication was made by any of them or their representative to a lawyer or his representative retained or consulted in common, when subsequently offered by one client against the other in a civil action." *Id.* at 506(C)(5).

[11]*See also* Richard C. Giller, *Confidentiality and Privilege in the Insurer-Policyholder-Defense Counsel Relationship*, A.B.A. SEC. LITIG. (undated), *available at* http://apps.americanbar.org/litigation/committees/insurance/articles/marapr2012-confidentiality-privilege.html (internal formatting omitted).

[12]Charles Silver & Kent Syverud, *The Professional Responsibilities of Insurance Defense Lawyers*, 45 DUKE L.J. 255 (1995).

agreement allows the parties and their counsel to disclose privileged information to one another without destroying the privileged nature of those communications. The joint defense doctrine is often discussed in cases involving the tripartite insurer-insured-counsel relationship. *Pennsylvania Casualty Co. v. Elkins*, 70 F. Supp. 155, 157-59 (D. Ky. 1947).

As in this case, a question that routinely arises in the insurance context is whether the attorney-client privilege or the joint defense doctrine applies to shield from disclosure those communications within the tripartite relationship. Whether a tripartite communication is protected from disclosure to a third party appears to turn on whether the insurer had the right and is exercising control over the defense of the underlying litigation. *In re Pfizer, Inc. Securities Litigation*, 1993 WL 561125, at *8 (S.D.N.Y. Dec. 22, 1993).[13]

It also depends on, in large part, whether the insurance policy at issue imposes a duty on the part of the insurer to provide the policyholder with a defense in the underlying litigation; which party - insurer or policyholder - selects and pays for counsel; and whether the insurer provides a defense with or without reservation. *Continental Cas. Co. v. St. Paul Surplus Lines Ins. Co.*, 265 F.R.D. 510, 519 (E.D. Cal. 2010).

Where as here, the insurer defends under a reservation of rights, denying the duty to indemnify on some or all of the claims, a number of courts hold that appointed defense counsel represents only the insured and not the insurance company. *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567 (E.D. Cal. 2002). *See also North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363, 366 (D.N.J. 1992):

---

[13]The *Pfizer* court found that disclosure of documents by Pfizer to its insurers waived the attorney-client privilege, noting a lack of evidence that Pfizer and its insurers "agreed to act as partners in a single unified ligation strategy." *Id.* at *8. However, the court held that to the extent the documents merited work product protection, "the disclosure of the documents to an insurance carrier will not operate as a waiver." *Id.*

> The [joint defense] doctrine has been recognized in the insured/insurer context when counsel has been retained or paid for by the insurer, and allows either party to obtain attorney-client communications related to the underlying facts giving rise to the claims, because the interests of the insured and insurer in defeating the third-party claim against the insured are so close that "no reasonable expectation of confidentiality is said to exist."

*Id.* (quoting *Carey-Canada, Inc. v. Aetna Cas. & Surety Co.*, 118 F.R.D. 250, 251 (D.D.C. 1987).

By contrast, when counsel is not retained by the insurer, independent counsel represents only the policyholder, and no attorney-client relationship exists between the insurer and independent counsel. *See Pfizer*, 1993 WL 561125, at *8 (rejecting the argument that an insured and its insurer share common interest about a legal matter and holding that disclosure by insured to insurer waived the attorney-client privilege). Providing a single defense counsel when a reservation of rights has been issued presents a conflict of interest. *See In re Babcock & Wilcox Co.*, Nos. 00-10992, 00-10993, 00-10994, 00-10995, 2004 WL 4945985, at *42-43 (Bankr. E.D. La. Nov. 9, 2004) (*Babcock I*), *order vacated on other grounds by In re Babcock & Wilcox Co.*, No. 05-0232, 2005 WL 4982364, at *1 (E.D. La. Dec. 28, 2005) (*Babcock II*).[14]

In this case there are multiple tripartite relationships. First is defense counsel, Ernst, who was hired by HCC to defend its insured, Supreme Towing, in the limitation action. (R. Doc. 177, p. 7). Second is defense counsel, Jeff Sanford, who was hired by HCC to defend Captain Barrios

---

[14]The Bankruptcy Court had recommended in *Babcock* that the "district court find that sufficient evidence has been produced to support" the allegation that the duty to defend was breached. *Babcock I*, at 43. However the subsequent vacation of the Order by the District Court did not specify that the Bankruptcy Court's reasoning as it related to breach of the duty of common interest was incorrect. *See Babcock II*, at *1-2. Instead, the Court in *Babcock II* stated without reasons that "[t]he Bankruptcy Court's Order of November 9, 2004 recommending confirmation of the Third Amended Plan of Reorganization is vacated." *Id.* at 2. In the Joint Motion submitted to the *Babcock II* Court in support of the Motion to Vacate the Bankruptcy Court's Order in *Babcock I*, several grounds were presented to the *Babcock II* Court. *See* No. 05-0232 (R. Doc. 116). These grounds included (1) the fact that several parties had withdrawn their notices of appeal, (2) the interested parties had negotiated a settlement and there was no pending objection to entry of an Order confirming an Amended Plan of Reorganization that had been submitted on September 28, 2005, and (3) other parties with pending objections had agreed to voluntarily move for their dismissal provided the September 28, 2005 Amended Plan of Reorganization became effective. *Id.* at 2-3. Therefore, the District Court's Order in *Babcock II* did not specifically call into question the Bankruptcy Court's determination of common interest liability in *Babcock I*.

in the limitation action. (R. Doc. 177, p. 11). Third is the Marcello Agency, retained by HCC and Supreme Towing's insurance agent, which purportedly acted on HCC's behalf and requested the retention of Sanford to participate in the coast guard hearing, and who communicated with defense counsel for HCC. (R. Doc. 169-1, p. 9; R. Doc. 177, p. 11; R. Doc. 177-2, pp. 3, 15-17).

HCC contends that because Judge Zainey, the District Judge to whom this matter was originally assigned, previously found that the attorney client privilege applied to the communications between HCC-Ernst-Supreme Towing, that this finding should extend to all instances of communications between HCC-Sanford-Supreme Towing and HCC-Marcello-Supreme Towing. Essentially, HCC contends that this ruling is the law of the case. The Court, however declines to extend Judge Zainey's ruling to the additional tripartite relationships and further finds that new information further precludes the application to the relationship between HCC-Ernst-Supreme Towing and HCC-Marcello-Supreme.

In the Fifth Circuit, "when a successor judge replaces another judge, the successor judge has the same discretion as the first judge to reconsider the first judge's order." *Stoffels ex rel. SBC Telephone Concession Plan v. SBC Communications, Inc.*, 677 F.3d 720, 728 (5th Cir. 2012) (quoting *Abshire v. Seacoast Products, Inc.*, 668 F.2d 832, 837-38 (5th Cir. 1982)). "The law of the case doctrine is not a command that trial judges never depart from previous rulings. Instead, it is a flexible doctrine, the application of which differs depending on, for instance, the characteristics of the issue that is being considered. . . ." *Stoffels*, 677 F.3d 728 n.3. Even where it is appropriate to apply, "the law of the case doctrine applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not." *Id.* (quotation omitted).

Judge Zainey's Order specifically found that Ernst's communications with HCC and Supreme Towing fell within the privilege, because HCC and Supreme Towing had a "common

13

interest." (R. Doc. 105, p. 3). He noted that due to a change in factual circumstances, while the Magistrate Judge's finding was "reasonable" at the time of the decision, and that new evidence, i.e., the fact that Supreme Towing changed its position to oppose Stone's request to depose Ernst, changed the result in between the time of the Magistrate Judge's decision and Judge Zainey's ruling. *Id.*

The undersigned finds that since Judge Zainey's ruling the facts have changed yet again, namely: (1) the testimony of general counsel for Continental , HCC's subsidiary, Healy has been taken which confirms although he understood there was a Coast Guard violation at the outset of the case, he did not clarify his role in the case with Ernst, defense counsel for Supreme Towing; (2) a declaration of Supreme Towing's defense counsel, Ernst, was secured by HCC/Continental and confirms that he communicated with the claims adjuster, general counsel, and coverage counsel; and (3) HCC's witness list includes Ernst as a "may call" witness without limitation. The Court therefore finds that it is appropriate to consider anew these facts whether the tripartite relationship between HCC-Ernst-Supreme Towing is such that the common interest doctrine applies or whether it was waived by the actions of HCC-Ernst-Supreme Towing.

Before the court can actually reach the issue, the question arises whether the Assignment Agreement between Stone and Supreme Towing allowed Stone to step into the shoes of Supreme Towing such that Stone fits the definition proscribed in LA. CODE EVID. ANN. art. 506(C)(5), i.e., that the common interest is waived when the communications are subsequently offered by one client against the other in a civil action.

HCC correctly points out that the Assignment Agreement expressly contained language reserving the privileges and protections pertaining to Supreme Towing's communications with HCC, its counsel and "joint interests." However, the Court is of the opinion that this does not preclude

a consideration of the issue as to whether HCC waived the privilege it had with Supreme Towing because HCC did initiate this suit against its insured Supreme Towing and further communications made before the filing of the Declaratory Action may have resulted in inappropriate disclosures, such that given the factual setting review is appropriate.

### 1.    HCC-Ernst-Supreme Towing Joint Interests/Waiver

The first relationship that must be analyzed is between HCC-Ernst-Supreme Towing. The issue is whether the common interests shields or the communications waive privilege between HCC-Ernst-Supreme Towing. Stone contends that there was a waiver because while Healy's counsel asserted objections to protect the documents that were used during the deposition from waiver, he testified without objection about the communications which it believes also constitutes a waiver. HCC in contrast, contends that no waiver occurred because its insured is not in the litigation. Even if a waiver occurred, HCC alleges Stone is still not entitled to the documents because the information is available through other sources namely Mike Shreve, the claims director for HCC and also the unsworn declaration of Greg Ernst.

According to the testimony of Dunbar Healy, the General Counsel of Continental Underwriters, a subsidiary of HCC, Healy confirmed that Ernst was retained to defend the interest of Supreme Towing shortly after the allision. Deposition of Dunbar Healy, Feb. 15, 2011("Healy Deposition"); (R. Doc. 169, Ex. 5, p. 58) He further confirmed that Ernst forwarded multiple reports to him repeatedly but he could not recall when those communications occurred.[15] *See id.* at pp. 65-66, 71-72, 299-300).

Healy testified that it was the practice of Continental when it contemplated the issuance of

---

[15]Counsel for HCC stipulated with Stones counsel that they could use document s during the deposition but that the production would not constitute a waiver. *Id.* at 13, 51:20-25 and 13, 52:3-4.

a reservation of rights letter to not send any defense communications from defense attorney to coverage counsel. *Id.* at 69-70. He further testified that they would not communicate substantive information provided by defense counsel to coverage counsel. *See id.* Healy testified that they would never issue a denial without approval from Houston Casualty. *Id.* at 71. Healy further testified that he knew very early and he believed there was an issue with a violation of a Coast Guard regulation since he knew that there had been an allision which suggested the possible violation of the 12-hour rule. *Id.* at 143.

Healy confirmed that there were a series of emails written by coverage counsel, Jeff Bridger to Greg Peuler and then also from Mike Shreve, the Claims Director, to Bridger involving the letter of undertaking. *Id.* at 73. He confirmed that the letter of undertaking prepared by Ernst was to broadly worded to protect the policy so they retained coverage counsel to assist them since there was going to be a reservation of rights. *Id.* at 78.

Healy acknowledged that he attended the trial on several days and that while he did not sit at counsel table with either Shreve or Ernst, he did speak with Ernst during the trial. *Id.* at 91. He confirmed that during the trial he spoke with Ernst about how the defense of the claim was going. *Id.* Healy testified that while he attended parts of the trial, he did not expect Ernst to believe that he was there to help him defend the case even though he did not recall ever telling Ernst that he was there on the coverage side of the case. *Id.* at 92.

He testified that after attending the trial, Ernst began either copying him or writing him directly about the status of the case. *Id.* at 94. Healy however acknowledged despite receiving status reports from defense counsel, he never advised him that he should not be sending them to him because he is on the coverage side of the case. *Id.* at 95. Healy corrected his testimony and indicating that he did recall telling Ernst that he should communicate with Shreve only on defense

issues. *Id.* at 96.

Healy testified that his involvement in the limitation proceeding terminated when the declaratory action was filed. Healy upon questioning acknowledged that he was familiar with the term "Chinese Wall" which not only means that coverage counsel should be kept separate but also that the flow of information should be protected to prevent and protect privilege information so that information does not get to coverage counsel that would prejudice the insured. *Id.* at 100.

After deciding it did not want to submit Ernst to a deposition, HCC/Continental secured an unsworn declaration from Ernst who acknowledges he was retained to represent Supreme Towing by Shreve. Therein, Ernst acknowledges that in his experience the insurance defense attorney was required to cooperate with the insurer in defending the insured, and to report to the insurer's representative handling the liability defense of the insured. Unsworn Declaration of Gregory L Ernst, July 19, 2012, ¶¶ B(2), D ("Ernst Decl."); (R. Doc. 171-20). As defense counsel, Ernst acknowledges that he communicated with coverage counsel Bridger about the conditional letter of undertaking. (Ernst Decl. ¶ H; (R. Doc. 171-20). Ernst stated that when he received the reservation of rights letter, he bracketed the portion that made reference to Supreme Towing's duty to fully comply with U.S. Coast Guard regulations with respect to manning and navigation requirements because he knew that such a violation could raise a coverage issue. *Id.* ¶ J.

Ernst knew that having outdated paper and area charts for an area such as Breton Sound, and he reported this fact to Shreve. *Id.* ¶ 11. Ernst remembered sending several status reports to Shreve about outdated paper and electronic charts on the *M/V CAPT. BRENNAN* and Supreme Towing's failure to update the charges to include information contained in Local Notices to Mariners, including July 2008, December 2008, January 2009, and October 2009. *Id.* ¶12. Ernst acknowledged that his reports to Shreve factually summarized the various depositions and reiterated

his opinion that these outdated charts did not cause the allision. *Id.* ¶ R.

Curiously, Ernst suggested that no one at CUL Companies/Fidelis Marine, HCC, or HCC's counsel told him that they considered the lack of updated charges as presenting a coverage issue even though HCC provided him with a reservation of rights letter noting it as a reason for the reservation. *Id.* ¶¶ I-J, 13. Thereafter, during a February 2, 2009, settlement conference in the limitation action at which Shreve, Healy, Ernst, and others were present, Ernst states that he assumed that Healy was present on behalf of Supreme Towing, and Ernst perceived Healy's actions as protecting the interests of Supreme Towing. *Id.* ¶15.

Ernst further states that during the course of the limitation action, coverage counsel, Bridger, would contact him for status updates. Ernst, defense counsel, acknowledges that he would speak with Bridger about the liability posture of the case including the fact that the vessel did not carry updated navigation charts or Local Notices to mariners. Ernst notes that while he spoke with coverage counsel, he also expressed his opinion that the absence of updated charts did not contribute to the allision. *Id.* ¶ W.

Ernst also acknowledges that during the trial of the limitations action he had lunch with Healy and Godfrey Barrios where they would discuss trial strategy generally and how to prevail on limiting the liability of Supreme Towing and while he had these lunches with Healy, Healy never told him that he was there acting for coverage instead of the defense of Supreme Towing. *Id.* ¶17. He further states that because he had spoken with Healy so often during the course of the trial, he began sending him status reports regarding the defense of Supreme Towing. *Id.* ¶ 18.

Ernst was even contacted by Healy post-trial to assist with the editing of a report to Supreme Towing, and he even met with Shreve and Healy to discuss settlement, strategy and appeal issues in the limitation action and that neither Shreve, the adjustor, nor Healy, the general counsel, ever

told him that they intended to deny coverage. *Id.* ¶ 20. After Ernst had been communicating with Bridger by giving him status reports, Bridger later told him that HCC intended to provide a supplemental reservation of rights based upon the very information that Ernst had shared with coverage counsel, Bridger, and Healy. *Id.* ¶ 24. While Ernst consulted and strategized with Healy during trial, he states in his declaration that they did not direct his activities. *Id.* ¶ RR.

Healy's testimony and Ernst's declaration confirm that Continental had no structure in place to protect its insured from incoming communications even though Continental had planned from the inception to assert a reservation of rights. While Healy testified that he was monitoring the file and acknowledged that he received reports from defense counsel, to the degree he looked at them he read them for coverage purposes only. The Court finds this statement disingenuous at best because this is clearly an admission that he read defense counsel reports in their entirety but purportedly for a different purpose; whereas he testified earlier that he never had communications with defense counsel.

Healy clearly spoke with Ernst, reviewed Ernst's reports, strategized for trial with Ernst while at lunch, while at the same time failing to disclose that his role was to address coverage. Healy even accepted status reports from Ernst about the liability portion of the limitations claim and Ernst "fed" Bridger and Healy information that supported their decision to assert a coverage defense against his client, Supreme Towing. For example, Healy admitted that he did not attend the deposition of Captain Barrios where the issue of the outdated charts was first revealed, that coverage counsel did not provide him with a copy of the transcript but that somehow he found out about this critical fact before trial. Healy Deposition, p. 58 (R. Doc. 169, Ex. 5).

Healy even testified that after the deposition of Godfrey Barrios he met with Ernst and Shreve, and at the meeting they discussed the charts issue. *Id.* at 193. While Healy did not disclose

to Ernst his role, Ernst did know that there was a reservation of rights in place in the case and should not have engaged in those discussions. *Id.* Ernst should not have had any communications with Healy or Bridger given the presence of the reservation of rights. Healy testified further that he did not understand how Ernst thought he was representing HCC because he was also aware of presence of the reservation of rights. *Id.* at 205. This impermissible exchange of information resulted in the classic waiver of attorney client privilege as between HCC-Ernst-Supreme Towing.

The next question is whether Stone should benefit from the waiver of privilege that occurred between HCC-Ernst-Supreme Towing. The Court finds that once the waiver occurred during the course of the limitations proceeding, the information became readily available to a third party such as Stone.

HCC next contends that even if there was a waiver, Stone is not entitled to the documents because Stone is not entitled to assert a claim of waiver or estoppel against it because it satisfied the obligation it might have owed to Supreme Towing by settling the underlying claim.[16] Further, HCC contends that Stone is not entitled to the documents because they are available elsewhere, i.e. from Shreve's deposition and Ernst's declaration. These questions submitted by HCC do not affect the finding that the privilege was waived and further there need not be any showing that they can not get the documents from any other source as they are available because of the waiver. *See Nguyen v. Excel Corp.*, 197 F.3d 200, 208 (5th Cir. 1999) (citing *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986)) (authorizing deposition of party's attorney, where party had waived the attorney-client privilege).

Consequently, the documents reflecting communications with Ernst are discoverable. As

---

[16]Whether Stone is entitled to pursue an estoppel claim against HCC is not before the undersigned Magistrate Judge and therefore does not present a bar to the disclosure of the documents.

a result, documents numbered 8, 11-12, 16, 18, 22, 24-25, 27, 32, 34, 36, 38-39, 41, 45, 47, 51, 54, 56-57, 67,[17] 59, 64, 66-67, 73-80, 84-85, 87, 90-91, 93-96, 104, 106, 109, 114, 117-23, 125-29, 132-33, 135, 137-39, 141, 143-44, 146-50, 159, 171, 173, 181, 183-86, 192, 194-99, 201, 205-07, 210, 212-14, 217, 219-20, 222, 225-26, 230, 232, 240, 243-47, 250-51, 253-55, 261-62, 264-65, 267, 271-76, 280, 282-83, 287-88, 290-91, 293-95, 299-307, 309, 311, 319-20, 324, 326, 328-32, 339, 343, 346-48, 356-57, 361, 363, 350-51,[18] 370-74, 377, 380, 386-87 shall be produced.

## 2.     HCC-Sanford-Supreme Towing Joint Privilege/Waiver

Stone also seeks production of documents involving communications with Sanford. HCC contends that Sanford's documents should be released because the common interest privilege was waived when HCC filed suit against its insured Supreme Towing. Stone identifies the following documents from HCC's privilege log of July 16, 2011 as Sanford documents that should be produced: Documents 13, 15, 19, 21, 28, 30-31, 42, 44, 53, 67, 187, 189, 202, 204, 227, 229, 233, 235, 256, 258, 277, 279, 366-69, 381, 383-84, 388, 390.

HCC contends that it did not waive any privilege as to Sanford. They posit the same arguments regarding the HCC-Sanford-Supreme Towing documents regarding the Ernst documents.

Healy testified that in connection with the claim that Supreme Towing's captain, John Barrios was named as a defendant, retained counsel for Captain Barrios. Jeff Sanford according to Healy was retained to provide a defense for him under a reservation of rights and that Sanford was instructed to report directly to Captain Barrios and not HCC or any of its agents. Healy Deposition, p. 83.

---

[17]It is unclear whether Stone requests Document "67" here, given that "67" was already requested later and would be out of sequence here.

[18]These numbers are out of sequence.

Healy acknowledged that after they issued the reservation of rights letter to Captain Barrios, that HCC never offered to hire a lawyer for him at their expense.[19] *Id.* at 293. Healy conceded that the only communication HCC had with Captain Barrios is that he was told that he told Captain Barrios that he could get his own independent lawyer and that he would have to pay for it himself. *Id.* at 294. HCC only received invoices from Sanford according to Healy and he would pass them on to Shreve for payment. *Id.* at 83. After being shown another email, Healy confirmed that Shreve sent an email to defense counsel Ernst advising him that Sanford was appointed to defend Captain Barrios and further that Shreve had spoken with Healy. *Id.* at 88. Healy further acknowledged that HCC did not issue a reservation of rights letter specifically referring to charts until September 29, 2010 when the trial of the proceeding was in March 2010. *Id.* at 295-96.

There is no evidence presented that Sanford communicated with HCC about the defense strategy or the evidence he obtained while defending his client, Captain Barrios. In fact, Healy testified that he had not had additional communications with Sanford. As such, the documents Stone has identified as relating to Sanford's communications, i.e., Documents 13, 15, 19, 21, 28, 30-31, 42, 44, 53, 67, 187, 189, 202, 204, 227, 229, 233, 235, 256, 258, 277, 279, 366-69, 381, 383-84, 388, are protected by the attorney client privilege and precluded from discovery.

### 3. HCC-Marcello Agency-Supreme Towing Joint Privilege/Waiver

Stone also seeks discovery of certain documents that reflect communications between HCC-Marcello Agency-Supreme Towing. The following documents on the privilege log that fall within

---

[19]The court in *Lectrolarm* concluded that the "first and most important element of the attorney client privilege" (i.e., a relationship between an attorney and a client) is missing when a conflict of interest regarding coverage requires the appointment of independent counsel by the insured. *Lectrolarm*, 212 F.R.D. at 571-72. The court held: "Nor can it be accurately said that the insurer is a necessary party to communications between [independent] counsel and the insured. Finally, in general, it is not likely that communications between the insurer and [independent] counsel would be for the purpose of giving or receiving legal advice because in such a case (where coverage is disputed) each is likely to have their own attorney." *Id.* at 572.

this category are Documents 14, 16, 18, 28-41 from a separate privilege log which HCC provided. (R. Doc. 169-27, Ex. 19).

Document 14 is an email communication regarding claim/litigation strategy and management, authored by Shreve, and received by Jerry Marcello of Supreme Towing,[20] Shelia Adams, Marcello's Secretary,[21] and Ernst. Document 16 is correspondence regarding claim/litigation strategy and management, authored by Marcello, and received by Godfrey Barrios.[22] Document 18 is an email communication regarding exposure evaluation, claim/litigation strategy and management, authored by Shreve, and received by Adams. Documents 28-30 are email communications regarding claim/litigation strategy and management, authored by Gia Morris[23] and Marcello, and received by John Kelly (Axiom, Ltd.),[24] Nancy Nodop (MMO, UW),[25] Bill Fehlis (WFT, Inc.),[26] and Amy Wright (WFT, Inc.).[27]

Documents 31-32 are email communications regarding claim/litigation strategy and management, authored by Leslie Guidry[28] and Marcello, and received by Robert Palmer (MMO,

[20]Marcello's role is unclear. HCC's Motion for Summary Judgment indicates that Marcello was Supreme Towing's insurance *broker*. (R. Doc. 171-3, p. 8). However, the deposition of Michael Shreve indicates that Shreve testified that Marcello was "the *agent*." (R. Doc. 171-16, p. 4, 23:21-22).

[21]Adams is Marcello's secretary. (R. Doc. 177-2, p. 3).

[22]Godfrey Barrios, who is related to Captain John Barrios, is the President of Supreme Towing. No. 07-9231, (R. Doc. 169, p. 54).

[23]Neither Morris' title nor role are identified in the submission.

[24]Kelly's role, beyond the description in the Marcello Privilege Log itself, is unspecified.

[25]Nodop's role, beyond the description in the Marcello Privilege Log itself, is unspecified.

[26]Fehlis' role, beyond the description in the Marcello Privilege Log itself, is unspecified.

[27]Wright's role, beyond the description in the Marcello Privilege Log itself, is unspecified.

[28]Neither Guidry's title nor role are identified in the submission.

UW)[29] and Nodop. Documents 33, 40 are email communications regarding claim/litigation strategy and management, authored by Guidry and Marcello, and received by Jason Holbrook.[30] Documents 34-35 are email communications regarding claim/litigation strategy and management, authored by Guidry and Marcello, and received by Al Pike III.[31] Documents 36 and 38 are email communications regarding claim/litigation strategy and management, authored by Morris and Marcello, and received by Kelly. Document 37 is an email communication regarding claim/litigation strategy and management, authored by Marcello, and received by Fehlis and Wright. Document 39 is an email communication regarding claim/litigation strategy and management (multiple copies, same document), authored by Guidry and Marcello, and received by Palmer and Nodop. Document 41 is an email communication regarding claim/litigation strategy and management (multiple copies, same document), authored by Guidry and Marcello, and received by Pike III. The Court finds that none of these documents is protected from production because HCC failed to identify the title and role of the recipients of the documents..

HCC has asserted the same basis for the privilege. HCC contends that Judge Zainey's ruling should extend to the Marcello Agency, however it does not present any further explanation.

According to the evidence, Healy testified during his deposition that Ernst was reporting to the claims director, Shreve, but he did not recall whether they had directed defense counsel to report to any one in particular. Healy Deposition, at p. 72. Ernst remembered sending several status reports to Shreve about outdated paper and electronic charts on the *M/V CAPTAIN BRENNAN* and Supreme Towing's failure to update the charges to include information contained in Local Notices

---

[29]Palmer's role, beyond the description in the Marcello Privilege Log itself, is unspecified.

[30]Neither Holbrook's title nor role are identified in the submission.

[31]Neither Pike III's title nor role are identified in the submission.

to Mariners, including July 2008, December 2008, January 2009, and October 2009. Ernst Decl.

¶12. Further, Ernst acknowledged in his declaration that his reports to Shreve factually summarized

the various depositions and reiterated his opinion that these outdated charts did not cause the

allision. *Id.* ¶ 12R.

Ernst stated that during a February 2, 2009 settlement conference he, Healy, and Shreve

attended, he perceived Healy and Shreve's actions as protecting the interests of Supreme Towing.

*Id.* ¶15.

Several documents from the July 16, 2011 privilege log call into question whether certain

documents constitute a waiver. For example, Documents 68-69 and 72 have the following

attributes:

> 68: "E-mail regarding reservation of rights." *Author*:[32] Jay M. Lonero, *Recipient*:[33]
> H. Dunbar Healy, Mike Shreve, Jeff Bridger.
>
> 69: "E-mail regarding reservation of rights." *Author*: Jay M. Lonero. *Recipient*: H.
> Dunbar Healy, Mike Shreve, Jeff Bridger.
>
> 72: "E-mail regarding defense of captain." *Author*: Jeff Bridger, responding to email
> from H. Dunbar Healy. *Recipient*: H. Dunbar Healy, Mike Shreve, Jay M. Lonero.

These documents contain the name of Shreve, along with coverage counsel Bridger and

general counsel Healy, who was also involved on the coverage side of this case. Additionally, in

reviewing the July 16, 2011 Privilege Log, the Court noticed that Documents 142, 145, 327, 352 and

353 are all communications by Shreve and including coverage counsel, which Healy admitted in his

deposition should not have occurred. Consequently, Documents 68, 69, and 72 are not protected

by the work product doctrine, because at this stage the "Chinese Wall" had collapsed.

---

[32]The Supplemental Privilege Log uses the phrase "document preparer" in place of "author."

[33]The Supplemental Privilege Log uses the phrase "document recipient" in place of "recipient."

### 4. __Other Communications Placed at Issue, HCC-Bridger/Lonero__

Stone contends that Documents 70-71 from the July 16, 2011 Privilege Log are clearly at-issue communications because they reference the reservation of rights. Stone contends that because the documents are at issue, they too should be produced.

HCC contends that these documents are privileged as they are between it an its coverage counsel. Consequently, they contend that these documents should not be produced.

In reviewing the record, the communications appear to present a classic example of the application of attorney client privilege.[34] They are direct communications between general counsel and coverage counsel. As such they are privilege and the Court has not been presented any evidence that as between coverage counsel and general counsel a waiver occurred.

Nonetheless, as to these documents Stone contends that because these documents are at issue in the declaratory action, they cannot be used as a sword and a shield, and by extension they should be disclosed. Notably, Stone does not suggest that there is any evidence in the record that HCC intends on using the substance or the testimony of either the authors or recipients of these particular documents. As a result, the court finds that just because they contain the same issue does not mean, without more, that the documents should be produced. There must be some evidence that HCC intends to use these documents in the proceeding. In light of the information submitted by the parties for review and the Court's conclusion that there is no evidence presented to support the suggestion that the "in-issue" doctrine should apply, the Court finds that these documents are privileged and not subject to production.

---

[34]70: "Draft reservation of rights." *Author*: Jay M. Lonero, Jeff Bridger. *Recipient*: H. Dunbar Healy. 71: "Evaluation." *Author*: Harold Vines. *Recipient*: H. Dunbar Healy.

### 5. **Non-Attorney Communications and Privileged/Work Product Doctrine**

Finally, Stone contends that HCC withheld several documents that are communications between non-attorneys and are simply internal communications within HCC. (R. Doc. 169-1, p. 17). The particular documents that are between non-attorneys and HCC at issue include:

> Nos. 2-7, 63, 71, 103, 105, 112-13, 140, 142, 145, 148, 151-56, 164-65, 167-68, 284-86, 296-98, 308, 327, 333-38, 342, 352-53, 393, 398, 418-35, 439-41, 447, 462, 464, 466-68, 471, 475-77, 479, 485-86, 494, 500-13. (Ex. 13, R. Doc. 169).

Stone further contends that certain documents appear to be fee statements and related correspondence which are not protected under the work-product privilege. (R. Doc. 169-1, p. 18). Stone argues that these documents would have been produced by HCC regardless of whether litigation was approaching. Specifically, Stone contends that Document 418, labeled a "Policy Application," is withheld on the basis that it contains evidence of the mental impressions, conclusions, opinions, and/or theories of the attorney. (R. Doc. 199, p. 9).[35] Documents 419-28, according to Stone, illustrate Supreme Towing's efforts to renew its HCC insurance policy and which HCC withheld on the basis of the work product privilege. *Id.*[36]

Finally, Stone contends that Documents 429-35 are internal corporate documents regarding litigation guidelines and claim handling procedures were nonetheless prepared in the ordinary course of business and not in response to this specific action or any other legal action.[37] Overall, Stone argues that these privilege assertions call into doubt all of HCC's other assertions, and warrants *in*

---

[35]The author of this document is Baldwin Brown, and the recipient is Houston Casualty. Baldwin Brown is not identified elsewhere in the pleadings. According to the Supplemental Privilege Log HCC withheld Document 418 on the basis of "Attorney-Client Communication, Attorney Work Product, Work Product." (R. Doc. 169-21, p. 31).

[36]According to the Supplemental Privilege Log, HCC withheld Documents 419-23 and 426-27 on the basis of "Work Product, Not Relevant" and Documents 424-25 and 428 on the basis of "Work Product." (R. Doc. 169-21, p. 31).

[37]Either Fidelis Claims Service, LLC (Nos. 429-31), or HCC (Nos. 432-35) authored all of these documents.

*camera* review of all other unresolved privilege objections.  *Id.* at 9-10.

HCC has not responded to the specific charges levied in Stone's supplemental filing, although it did argue in opposition to Stone's original motion that all of these documents, while admittedly characterized as internal reports, contain evidence of counsel's mental impressions, conclusions, and opinions, are not protected by the attorney-client privilege, but the work-product privilege.  (R. Doc. 177, p. 18).  HCC also argues, without specificity, that Stone has no compelling need for the documents, and that they are not relevant to the claims to be tried.  *See id.* at 14-15.

The work-product doctrine "is not an umbrella that shades all materials prepared by a lawyer, or agent of the client.  It focuses only on materials assembled and brought into being *in anticipation of litigation.*"  *Beal v. Treasure Chest Casino*, No. 98-0786, 1999 WL 461970, at *2 (E.D. La. July 1, 1999) (Roby, M.J.) (citing *United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982)) (emphasis added).  Notably,  "[i]t is the very nature of an insurer's business to investigate and evaluate its claims."  *Id.* at *3.

In reviewing the privilege log, Documents 2-7 are documents from Shreve to HCC and Unknown to HCC.  Specifically, Document 2, 4, 7 are incident note forms, authored by Shreve, and received by HCC.  Documents 3, 5 are incident inquiry forms, authored by Unknown, and received by HCC.  Document 6 is a loss notification and description, authored by Shreve, and received by HCC.  As such, Documents 2-7 appear on their face to not be protected by the work product doctrine.

Also at issue are Documents 63, 71, 103, 105, 112-13, 140, 142, 145, 148, 151-56, 164-65, 167-68, 284-86, 296-98, 308, 327, 333-38, 342, 352-53, 393, 398, 418-35, 439-41, 447, 462, 464, 466-68, 471, 475-77, 479, 485-86, 494, and 500-13.  Document 63 is entitled Loss Notification and Description which is sent by Shreve to HCC giving them notice that the allision occurred. Document

71, as previously mentioned, is an evaluation by Harold Vines, Vice President of Claims for HCC, to Healy which is subject to work product protection. Documents 103 and 105 are emails by Shreve to Healy regarding the counter-indemnity letter and communication with counsel and stipulation for value limitation. Documents 112-13 are the CUL-Large Loss Report along with notes of Shreve written to HCC. Documents 63, 103, 105, 112, and 113 are not protected by the work product doctrine as they appear to be associated with traditional claims adjusting services. They were written by a claims adjuster retained by HCC to adjust the claim and the entries are reflective that he was engaged in traditional claims adjusting services. Document 71 is protected.

Documents 140, 142, 145, 148, 151-56, 164-65 are also allegedly subjected to the work product doctrine. Document 140 is an email written by Shreve to Diane Dyckman, Vice President of Claims at HCC, and Vines regarding the loss and indicates that it was in anticipation of litigation. Document 142 is an email by Shreve to Healy regarding the reservation of rights letter along with a report from Ernst. Document 145 is an email regarding instructions to counsel by Shreve to Healy. Document 148 is an email with potential expert surveyor by Shreve to Norm Dufour.[38] Documents 151-156 are incident inquiry forms with an unknown author to HCC, a memorandum regarding litigation by Shreve to HCC. Documents 164-65 are a large loss report from Shreve to HCC and a transmittal e-mail by Shreve to Vines, Dyckman and Diana Terrell.[39]

In reviewing the privilege log Documents 142, 145, 151-156 are not protected by the work

---

[38]In Healy's deposition Healy alludes to the fact that Dufour may be an expert witness. Healy Deposition, 264:16-22 (R. Doc. 169-9). When deposed a second time, Healy says "I'm confused . . . because of your question that I appointed Norm Dufour. Maybe Norm Dufour did go and I don't know who he was appointed for. So I'm confused." (R. Doc. 169-11, p. 59:10-13). In Godfrey Barrios' deposition, however, Barrios states that Dufour was hired by "the insurance company," and that Dufour "actually went on the *CAPTAIN BRENNAN* at some point." (R. Doc. 171-11, p. 8, 187:17-23).

[39]Neither Terrell's title nor role is identified in the submission.

product doctrine as they have no relation to any attorney opinion and the facts contained within these documents are discoverable. Further, to the extent that Shreve was communicating with Healy when he only should have been communicating with Ernst, such communication would render these documents subject to production. Documents 140 and 164-65 consist of emails from Shreve to Dyckman and a large loss report which require the court to review *in camera* regarding the communication as there is no indication in the submission as to the role of Dyckman in the limitation matter. Document 148 is protected by the work product doctrine.

Documents 167-68, 284-86, 296-98, 308, 327, 333-38, 342, 352-53 are also purportedly not protected and therefore subject to disclosure. Documents 167-68 and 284 are large loss reports written to Houston Casualty. Documents 285-86 are incident inquiry forms by an unknown author to Houston Casualty. Document 308 is a document authored by Shreve which contained his notes and was written to Houston Casualty. Document 327 is authored by Shreve and is an email to Duane Dyckman,[40] forwarding email from Jay Lonero, coverage counsel. Document 333 is an incident inquiry form by an unknown author and sent to Houston Casualty. Document 334 is a large loss report authored by Shreve to Houston Casualty. Document 335 is a memorandum to the file authored by Healy. Document 336 is an incident inquiry form by an unknown author to Houston Casualty. Document 337 is a large loss report authored by Shreve to Houston Casualty and 338 is a coverage analysis set-up analysis authored by Shreve to Houston. Document 342 is a file memorandum by Healy. Document 352 is an email regarding reserves by Shreve to Dyckman, Vines, Terrell and Healy. Document 353 is an email regarding post-trial comments of defense counsel by Dyckman to Shreve and Healy.

---

[40]As noted earlier, there are several iterations of "Dwayne" "Diane" and "Duane" Dyckman.

The large loss reports referenced in Documents 167-68, 284, 334, and 337-38 shall be produced for *in camera* review. In contrast, Documents 285-86, 308, 333, 327[41], 336, and 352-53 are not protected by the work product doctrine and shall be disclosed. Documents 335 and 342 are memos by Healy and are protected by the work product doctrine. Documents 296-98 are not protected.

Additionally, Stone seeks production of Documents 393, 398, 418-35, 439-41, 447, 462, and 464. Document 393 is an e-mail from Healy to Elder Brown, owner of Continental, Baldwin Brown, an Underwriter for Continental,[42] and Shreve, forwarded by Lonero to Healy, Vines, and Bridger.

Documents 398, 419-21 are a series of emails. The first email, Document 398, is to Vines regarding mediation and Declaratory Judgment and is authored by Healy. Document 419 is an email authored by Lisa Melancon[43] to Jane Mosgrove, Continental's Broker-Underwiritng Analyst,[44] and is regarding the renewal quote. Document 420 is an email by Pam Zimmerman[45] regarding renewal quote to Marcello, Gia Morris, and Melancon. Document 421 is an email by Mosgrove to Simonne Brown[46] regarding renewal quote forwarding an email of Melancon forwarded an email of Morris. Document 418 is the policy application prepared by Baldwin Brown to Houston Casualty.

Documents 418 and 420-21 are subject to production as they are not protected by the work

---

[41]Shreve reporting to coverage counsel and the underwriter when he was only suppose to be managing the claim side of the matter, per the testimony of Healy.

[42](R. Doc. 169-7, p. 7).

[43]Neither Melancon's title nor role are identified in the submission.

[44]Mosgrove appears in an email in (R. Doc. 171-9, p. 1, where she requests from "Claude" (otherwise unspecified) that "we will need audits done on the following accounts," and lists Supreme Towing among them. *Id.* Notably, the document also classifies "CUC Companies" as "A subsidiary of HCC Insurance Holdings, Inc." *Id.*

[45]Neither Zimmerman's title nor role are identified in the submission.

[46]Neither Brown's title nor role are identified in the submission.

product doctrine. Documents 393 and 419 are communications which require additional review and shall be produced for *in camera* consideration by the Court. Document 398 is protected by the work product doctrine.

Documents 422 and 427 are emails by Simone Brown regarding renewal to Morris. Document 423 is an email by Mosgrove regarding renewal to Joseph Morency. Document 424 is a Loss History generated by Shreve to HCC. Neither 423 nor 424 are privileged. Documents 425 and 428 are entitled Protection and Indemnity Loss Record, generated by Shreve and received by HCC. Document 426 is an email by Simonne Brown regarding renewal and received by Baldwin Brown. Clearly, Documents 422 and 425-28 are all subject to production as they are not protected by the work product doctrine.

Document 429 is the Fidelis Claim Service, LLC's Claim Handling Procedures for Houston Casualty Company and Other Underwriters generated by Fidelis Claims Service, LLC, with no recipient. Document 430 is the Fidelis Claim Service, LLC Litigation Management and Billing Policy of Fidelis Claims Service, LLC, with no specified recipient. Document 431 is entitled Fidelis Claim Service, LLC Selection of Attorneys, Adjusters, Surveyors, and Structured Settlement Firms, generated by Fidelis Claims Service, LLC, with no specified recipient. Documents 429-31 are not protected by the work product doctrine and shall be produced.

Document 432 is the HCC Corporate Claims Manual Relevant to Non-Covenant Companies, with no specified recipient. Document 433 is Procedure for Reporting to HCC's Litigation Department relevant to Non-Covenant Companies generated by HCC, with no specified recipient. Document 434 is the HC Litigation Management Guidelines Relevant to Non-Covenant Companies, with no specified recipient. Document 435 is the HCC Litigation Management Guidelines Relevant to Non-Covenant Companies, with no specified recipient. Documents 439 and 441 are emails from

Healy regarding depositions to Vines. Documents 429-35 are subject to production. In contrast, Documents 439 and 441 are protected by the work product doctrine.

Document 440 is an e-mail by Vines regarding depositions to Healy. Document 447 is an e-mail by Vines regarding status, intervention, and depositions forwarding email from Bridger, and received by Stefano Minale.[47] Document 462 is an email by Vines regarding the Counter Claim and future handling, forwarding email of Vines from Bridger to Minale. Document 464 is an email by Healy regarding Answer to Counter-Claim forwarding email from Bridger to Vines. Documents 440, 447, 462, and 464 are protected by the work product doctrine.

Finally, Stone contends that Documents 466-68, 471, 475-77, 479, 485-86, 494, and 500-13 are purportedly subject to disclosure. Document 466 is an email by Healy regarding Fee Statement to Vines. Document 467 is a reply email by Vines regarding Fee Statement to Healy. Document 468 is an email by Dyckman regarding status of appeal and Fee Statement forwarding email of Shreve, and received by Minale and Vines. Documents 466-67 are protected by the work product doctrine and Document 468 is not protected.

Document 471 is an email regarding initial allotment of case by Dyckman to Vines. Document 475 is an email regarding Declaratory Judgment action, by Healy to Vines. Document 476 is an email regarding Declaratory Judgment action by Vines to Healy. Document 477 is an email regarding reservation of rights letter and transmitting email by Lonero to Healy. Document 479 is an email regarding mediation results and Declaratory Judgment by Vines to Minale. Document 471, 477 and 479 are not protected by the work product doctrine because these documents are communications as between underwriters; however, Documents 475-76 are protected

---

[47]Neither Minale's title nor role are identified in the submission.

by the work product doctrine.

Documents 485-86 are emails from Lonero regarding mediation and reservation of rights forwarded between Vines and Minale. Document 494 is an email regarding privileged materials inadvertently produced by Healy to Vines. Document 500 is an email regarding coverage issues by Healy to Dyckman and Vines. Document 501 is an email regarding coverage issues and defense strategy by Shreve to Dyckman and Vines. Documents 485-86, 494, 500 are protected by the work product doctrine; however, Document 501 is not protected by the work product doctrine.

Document 502 is an email regarding coverage issues by Dyckman to Minale and Vines. Document 503 is an email regarding reservation of rights by Shreve and received by Dyckman, Vines, Terrell, and Healy. Document 504 is an email transmitting report from counsel by Shreve to Dyckman, Vines, Terrell and Healy. Document 505 is an email regarding mediation and recommendations of defense counsel by Dyckman to Minale and Vines. Document 506 is an email regarding mediation and recommendations of defense counsel by Shreve and received by Dyckman and Vines. Document 507 is an email regarding mediation and recommendations of defense counsel by Dyckman to Shreve and Vines. Documents 502 and 505 are protected by work product doctrine, Documents 503, 504, 506, and 507 are not protected by the work product doctrine

Document 508 is an email regarding mediation by Dyckman to Minale and Vines. Document 509 is an email regarding mediation recommendations of counsel by Shreve and received by Dyckman, Vines, and Terrell. Document 510 is an email regarding mediation and recommendations of defense counsel generated by Dyckman to Shreve, Vines, and Healy. Document 511 is an email regarding mediation and recommendations of defense counsel generated by Shreve and received by Vines, Dyckman, Terrell, and Healy. Document 512 is a transmittal email regarding report of defense counsel, Greg Ernst, regarding settlement conference and

mediation, generated by Shreve and received by Dyckman, Vines, and Terrell. Documents 508 and Documents 509, 510, 511, and 512 are not protected by the work product doctrine.

Document 513 is an email by Dyckman transmitting defense counsel's post-trial report and Healy's post-trial memorandum by Dyckman to Vines which is not protected by the work product doctrine.

Accordingly,

**IT IS ORDERED** that Counter-Claimant, **Stone Energy Offshore, LLC's Motion to Compel Production of Documents Withheld as Privileged (R. Doc. 169)** is **GRANTED IN PART** and **DENIED IN PART.**

It is **GRANTED** as it relates to production of all documents marked as privileged from the Marcello Agency Privilege Log.

It is also **GRANTED** as it relates to production of the following documents from HCC's Privilege Log of July 16, 2011. HCC shall produce the following documents to Stone by **5 p.m. on Friday, September 14, 2012**:

> 2-8, 11-12, 16, 18, 22, 24-25, 27, 32, 34, 36, 38-39, 41, 45, 47, 51, 54, 56-57, 63, 67, 59, 64, 66-69, 72-80, 84-85, 87, 90-91, 93-96, 103-06, 109, 112-14, 117-23, 125-29, 132-33, 135, 137-39, 141-516 159, 171, 173, 181, 183-86, 192, 194-99, 201, 205-07, 210, 212-14, 217, 219-20, 222, 225-26, 230, 232, 240, 243-47, 250-51, 253-55, 261-62, 264-65, 267, 271-76, 280, 282-83, 285-88, 290-91, 293-309, 311, 319-20, 324, 326-33, 336, 339, 343, 346-48, 352-53, 356-57, 361, 363, 350-51,[48] 370-74, 377, 380, 386-87, 418, 420-26, 428-35, 468, 471, 477, 479, 501, 503-08, 511-12.

It is **DENIED** as it relates to production of the following documents from HCC's Supplemental Privilege Log of July 16, 2011:

> 13, 15, 19, 21, 28, 30-31, 42, 44, 53, 67, 70-71, 148, 187, 189, 202, 204, 227, 229, 233, 235, 256, 258, 277, 279, 335, 342, 366-69, 381, 383-84, 388, 390.398 425, 428,

---

[48]These numbers are out of sequence.

439, 440-41, 447, 462, 464, 466-67, 475-76, 485-86,494, 500, 502, 505, 509-10, 513.

It is **GRANTED** for *in camera* review as it relates to production of the Documents 140, 164-65, 167-68, 284, 334, 337, 338, 393, 419 from HCC's Supplemental Privilege Log of July 16, 2011. HCC shall produce these documents to the Court for *in camera* inspection by **5 p.m. on Friday, September 14, 2012**.

The Court will render its final decision on the documents submitted for *in camera* later today.

New Orleans, Louisiana, this 14th day of September 2012.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**